IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-41224

_____

COCA-COLA BOTTLING COMPANY
OF THE SOUTHWEST,

                                        Petitioner,

versus

FEDERAL TRADE COMMISSION,

                                        Respondent.


_____

Petition for Review of an Order of the
Federal Trade Commission

_____

June 10, 1996

Before REAVLEY, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

     Today we review a divestiture order of the Federal Trade
Commission.  We must decide whether the Soft Drink Interbrand
Competition Act of 1980, 15 U.S.C. § 3501-03, governs the antitrust
legality of an exclusive territorial soft drink license previously
held by a competing soft drink bottler that was a subsidiary of the
licensor.  The FTC seeks to undo a 1984 transaction in which the Dr
Pepper Company, a manufacturer of soft drink concentrates and
syrups, licensed the Coca-Cola Bottling Company of the Southwest,
a Texas bottler, to distribute exclusively the Dr Pepper soft drink
brand in a defined territory.  The FTC found the Soft Drink Act
inapplicable, ruling that the 1984 licensing of Coca-Cola Southwest

and withdrawal of Dr Pepper from distribution was substantially likely to lessen competition in violation of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and § 7 of the Clayton Act, 15 U.S.C. § 18.

We hold that the FTC used the wrong legal standard in finding that § 5 of the FTC Act prohibited this change in distribution. We vacate the FTC's divestiture order and remand for a consideration of the transaction's validity under the Soft Drink Act.

## I.

### A.

Petitioner, Coca-Cola Bottling Company of the Southwest, is a regional bottler and fountain distributor of Coca-Cola, Dr Pepper, and other soft drink brands in South and Central Texas. Coca-Cola Southwest operates with trademark licenses from manufacturers of soft drink concentrates and syrups, the flavoring ingredients in retail soft drink beverages. A license creates an exclusive territorial franchise whereby the manufacturer supplies soft drink concentrates and syrups to its licensee, which bottles and sells the branded soft drinks in a defined geographic area.

The Dr Pepper Company is the nationwide manufacturer of concentrate and syrup for its Dr Pepper soft drink brand. At issue in this appeal is a 1984 transaction in which Dr Pepper Company licensed Coca-Cola Southwest to bottle and distribute Dr Pepper soft drinks in a ten-county territory around San Antonio, Texas. Until 1984, Dr Pepper Company was a publicly held corporation that

2

did not distribute through an independent bottler in the San Antonio area. Rather, it carried its product to the consumer through its wholly owned bottling subsidiary, San Antonio Dr Pepper Bottling Company. Dr Pepper-San Antonio was also the exclusive bottler for other concentrate manufacturers, including Canada Dry, Big Red, Royal Crown, Crush, and Hires. Here began the events leading directly to the distribution changes attacked by the FTC.

In 1984, Forstmann Little acquired Dr Pepper Company in a leveraged buyout. After the buyout, Forstmann Little arranged for Dr Pepper Company to sell its company-owned bottling operations, including Dr Pepper-San Antonio, and to distribute through independent bottlers. Dr Pepper Company attempted to sell the San Antonio bottling operation as a whole, but was unable to do so. Coca-Cola Southwest was interested in the subsidiary's Dr Pepper and Canada Dry licenses, but had no need for its main production facility. Unable to sell its entire bottling operation, Dr Pepper licensed Coca-Cola Southwest. Coca-Cola Southwest paid $14.5 million to Dr Pepper for a license to bottle and sell Dr Pepper and Canada Dry.[1] Coca-Cola Southwest also purchased certain of Dr Pepper Company's property used in distributing its product: a warehouse, 2150 used vending machines, and 40% of its used delivery and over-the-road trucks, for $2.5 million.

After the August 1984 transaction, Dr Pepper-San Antonio retained ownership of its bottling plant and its licenses for

---

[1]Coca-Cola Southwest initially bid $5 million for both the Dr pepper and Canada Dry franchises, but subsequently increased its offer to $14.5 million.

brands other than Dr Pepper and Canada Dry, and for a short while thereafter, Dr Pepper Company continued operating the subsidiary as a bottler and distributor for these other brands in its 28-county territory.[2] Later that year, Dr Pepper Company sold Dr Pepper-San Antonio's bottling plant and its other property and rights to a new entrant, Grant-Lydick Beverage Company. Thus, by the end of 1984, Dr Pepper Company had withdrawn from bottling and distribution in two separate transactions, involving Coca-Cola Southwest and then Grant-Lydick. Coca-Cola Southwest held the licenses for the Dr Pepper and Canada Dry brands, along with a handful of Dr Pepper-San Antonio's assets, while Grant-Lydick had obtained the subsidiary's remaining assets and rights, its bottling plant and other licenses,[3] including Big Red, Royal Crown, Crush, and Hires.

On July 29, 1988, the FTC issued an administrative complaint challenging Coca-Cola Southwest's 1984 receipt of the Dr Pepper and Canada Dry licenses.[4] The complaint alleged that this acquisition

---

[2]At the time of the August 1984 transaction, there were a total of five competing soft-drink bottlers operating in San Antonio, including Coca-Cola Southwest and Dr Pepper-San Antonio.

After 1984, Coca-Cola Southwest was involved in two additional transactions resulting in its receipt of new licenses from the Dr Pepper Company. First, in December 1986, Texas Bottling Group, Inc. purchased Coca-Cola Southwest; the FTC and the Dr Pepper Company were notified of the transaction, after which Dr Pepper Company issued new Dr Pepper licenses to Coca-Cola Southwest. Texas Bottling Group is still the sole shareholder of Coca-Cola Southwest. Second, in April 1987, Coca-Cola Southwest acquired the assets of the bottler of Dr Pepper and Coca-Cola soft drink products in Corpus Christi; again, as part of that transaction, the Dr Pepper Company issued new Dr Pepper licenses [to Coca-Cola Southwest] for the adjacent Corpus Christi territory.

The FTC explains that it did not find out about the 1984 transaction until after it was completed, noting that Coca-Cola

4

substantially lessened competition in violation of § 5 of the FTC Act, 15 U.S.C. § 45, and § 7 of the Clayton Act, 15 U.S.C. § 18. It sought, <u>inter alia</u>, to require Coca-Cola Southwest to divest the Dr Pepper and Canada Dry licenses and assets acquired in 1984.

An administrative law judge held a thirteen-week hearing beginning on July 10, 1990. On June 14, 1991, the ALJ rendered his initial decision in favor of Coca-Cola Southwest, concluding that a reduction in competition was unlikely and ordering dismissal of the complaint.[5] The FTC's complaint counsel appealed to the full Commission. On August 31, 1994, the Commission entered a decision reversing the ALJ's initial decision.[6] The Commission declined to consider Coca-Cola Southwest's 1984 receipt of the Dr Pepper and Canada Dry licenses under the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. § 3501-03, and instead agreed with complaint counsel that Coca-Cola Southwest's acquisition of the Dr Pepper franchise violated the FTC Act and the Clayton Act. For different reasons than those set forth by the ALJ, the Commission ruled that

---

Southwest's purchase of the Dr Pepper assets was broken into two contracts (the $14.5 million acquisition and a $2.5 million sales agreement), each of which was below the Hart-Scott-Rodino Act's reporting threshold of $15 million.

The ALJ determined that (1) the relevant product market included all carbonated soft drinks and other similar non-carbonated soft drinks; (2) the relevant geographic market was broader than the ten-county San Antonio area pled by Complaint Counsel; (3) entry was easy; (4) competition had been fierce; (5) no customer had complained about the situation; and (6) there was no likelihood of anticompetitive effects from Coca-Cola Southwest's receipt of the 1984 Dr Pepper licenses.

Three Commissioners participated in the decision; one filed a concurring and dissenting opinion, and the author of the main opinion also filed a separate concurring opinion.

Coca-Cola Southwest's receipt of the Canada Dry franchise did not violate the federal antitrust laws.[7]  Accordingly, the Commission entered a Final Order requiring Coca-Cola Southwest to divest the Dr Pepper license and to obtain prior approval from the Commission before acquiring any additional branded soft-drink assets in areas in which Coca-Cola Southwest was already doing business.

On October 7, 1994, Coca-Cola Southwest filed a motion for reconsideration and a stay before the Commission.  The Commission, however, never acted on those motions.  On November 22, 1994, Coca-Cola Southwest petitioned for review of the Commission's decision.[8]

II.

Coca-Cola Southwest challenges the Commission's divestiture order on multiple grounds.  Coca-Cola Southwest argues that the Commission erred in refusing to apply the Soft Drink Interbrand Competition Act; in defining the relevant product and geographic markets; in its findings of barriers to entry; in refusing to allow Coca-Cola Southwest to rebut certain documents admitted after the close of evidence; and in according insufficient weight to certain evidence that favored Coca-Cola Southwest.

Although this case does not yield an easy answer, we are persuaded that the FTC should have applied the Soft Drink Act in

---

The FTC found that Coca-Cola Southwest's receipt of the "Dr Pepper" and "Canada Dry" franchises increased its share of the relevant market from 44.7% to 54.5%.

The divestiture order is automatically stayed pending this appeal.  15 U.S.C.A. § 45(g)(4).

this instance.  We decline to reach Coca-Cola Southwest's remaining contentions.

A.

We review de novo the question whether the FTC erred in not applying the Soft Drink Act's legal standard in this case.

The FTC's administrative complaint against Coca-Cola Southwest charged that the effect of Coca-Cola Southwest's 1984 acquisition of the exclusive Dr Pepper license for the San Antonio area may be substantially to lessen competition in soft drink products in that area in violation of § 5 of the FTC Act, 15 U.S.C. § 45, and § 7 of the Clayton Act, 15 U.S.C. § 18.[9]  Coca-Cola Southwest argues that the FTC erred in examining the 1984 transaction under the Clayton Act's "effect-may-be-substantially-to-lessen-competition" standard. According to Coca-Cola Southwest, the Soft Drink Act supersedes the FTC and Clayton Acts and legitimizes its receipt and use of the Dr Pepper license for the San Antonio Area so long as the Dr Pepper brand "is in substantial and effective competition with other

---

[9]Section 7 of the Clayton Act provides:  "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Section 5 of the FTC Act empowers the FTC with authority to attack transactions that are unlawful under § 7 of the Clayton Act:  "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."  15 U.S.C. § 45(a)(1).  The FTC may enter an "order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice."  15 U.S.C. § 45(b).

7

products of the same general class in the relevant market or markets."  15 U.S.C. § 3501.

Congress enacted the Soft Drink Act in response to two cases from the 1970's[10] in which the FTC ruled that exclusive territories used by the Coca-Cola Company and PepsiCo were unlawful vertical restraints of trade in violation of § 5 of the FTC Act.  H.R. Rep. No. 96-1118, 96th Cong., 2d Sess. 3-4 (1980), reprinted in 1980 U.S.C.C.A.N. 2373, 2375; S. Rep. No. 96-645, 96th Cong., 2d Sess. 6-9 (1980).  Congress passed the Soft Drink Act to assure that territorial restrictions in soft drink licenses would be evaluated under the rule of reason analysis as articulated in <u>Continental T.V. Inc. v. GTE Sylvania, Inc.</u>, 433 U.S. 36 (1977).  To that end, the Soft Drink Act provides, in relevant part:

> Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agreement, pursuant to which the licensee engages in the manufacture (including manufacture by a sublicensee, agent, or subcontractor), distribution, and sale of a trademarked soft drink product, of provisions granting the licensee the sole and exclusive right to manufacture, distribute, and sell such product in a defined geographic area or limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product for ultimate resale to consumers within a defined geographic area:  *Provided*, That such product is in substantial and effective competition with other products of the same general class in the relevant market or markets.

15 U.S.C. § 3501.  The Soft Drink Act defines "antitrust law" to mean the Sherman Act, 15 U.S.C. 1 et seq., the Clayton Act, and the FTC Act, <u>see</u> 15 U.S.C. § 3503; its plain text thus establishes that

---

[10]<u>See</u> <u>The Coca-Cola Co.</u>, 91 F.T.C. 517 (1978), <u>rev'd and remanded</u>, 642 F.2d 1387 (D.C. Cir. 1981); <u>Pepsico, Inc.</u>, 91 F.T.C. 680 (1978), <u>rev'd and remanded</u>, 642 F.2d 1387 (D.C. Cir. 1981).

the FTC and Clayton Acts cannot "render unlawful" an exclusive territorial restriction in a soft drink license so long as the licensed brand "is in substantial and effective competition" with comparable soft drink products in the relevant market. If the Soft Drink Act applies <u>and</u> the requisite "substantial and effective competition" exists, the FTC cannot enforce the FTC Act or Clayton Act in a manner that invalidates the exclusivity provisions in Coca-Cola Southwest's Dr Pepper license for the San Antonio area.

The FTC contends that while the Soft Drink Act authorizes the use of territorial restrictions in soft drink licenses, it does not govern the legality of a horizontal combination of such licenses. Thus, the FTC insists that the Soft Drink Act is inapplicable here "[b]ecause this case concerns only the validity of combining in one bottler the franchises of two competing brands, and in no way challenges the legality of exclusive territorial restrictions." According to the FTC:

> At issue in this proceeding is whether a combination of the Coca-Cola franchise with the Dr Pepper franchise in the San Antonio market may substantially lessen competition in violation of §§ 5 of the FTC Act and 7 of the Clayton Act. The Commission is not challenging the right of [Dr Pepper Company], or any other concentrate manufacturer, to grant an exclusive franchise for its brand, but only a bottler's right to acquire a competing bottler's franchise where competition in the relevant market may be adversely affected. The Commission has in no way attacked the legality of [Dr Pepper Company's] exclusive territorial license, and "[n]othing in [the Soft Drink Act] is intended to protect . . . any other practice or conduct of licensors or licensees . . . from challenge under the antitrust laws." S. Rep. 10. In other words, by merely legitimizing exclusive territories, the [Soft Drink Act] does not grant a bottler the unfettered right to acquire any license of its choice.

The FTC points out that there was a horizontal transfer of assets to Coca-Cola Southwest from a former competitor and thus views the 1984 transaction as "a `garden variety' horizontal acquisition in which one competitor has purchased the assets of another."

Coca-Cola Southwest disputes the FTC's characterization and urges that Dr Pepper Company's issuance of the Dr Pepper franchise to Coca-Cola Southwest was vertical, not horizontal. According to Coca-Cola Southwest:

> The end result of the challenged 1984 transaction was to structure a vertical exclusive licensing arrangement between [Dr Pepper Company] and [Coca-Cola Southwest]. If [Dr Pepper Company] had had no prior presence in San Antonio and in 1984 had structured an exclusive licensing arrangement with [Coca-Cola Southwest], there could be no question that the [Soft Drink Act] standard would govern. The policy considerations under the [Soft Drink Act] are no different when the soft drink concentrate manufacturer already has a presence in the territory and structures the exclusive licensing arrangement with the new licensee [Coca-Cola Southwest].

As the parties see it, this case pivots on dueling characterizations. On one hand, Coca-Cola Southwest insists that the Soft Drink Act governs here because its 1984 transaction was vertical in that Dr Pepper Company issued a new franchise to a downstream distributor, Coca-Cola Southwest. On the other hand, the FTC finds the Soft Drink Act inapplicable because the transaction was horizontal in that Coca-Cola Southwest gained market share by acquiring an additional exclusive license from a competing local bottler, Dr Pepper-San Antonio. In short, the parties' framing of the inquiry suggests that the applicability of the Soft Drink Act turns on the question of whose characterization

10

prevails:  Coca-Cola Southwest wins if we say that the transaction was vertical, while the FTC wins if we see it as horizontal.

We do not find the applicability of the act to be so easy. The transaction was neither purely vertical nor purely horizontal. The events culminating in the grant of the Dr Pepper license to Coca-Cola Southwest evinced both vertical and horizontal aspects. Of course, the horizontal features of the transaction are less than 15% of the deal, measured in dollars.  FTC does not dispute that Dr Pepper Company was considering its own interests when it chose to license Coca-Cola Southwest in connection with its effort to close down Dr Pepper-San Antonio and distribute instead through an independent bottler.  Coca-Cola Southwest, in turn, does not dispute that its use and enforcement of the Dr Pepper franchise may have an impact on interbrand competition at the distributor level. In sum, even in the language of the parties the critical question is not whether the transaction was vertical or horizontal, but whether it was sufficiently vertical to come within the ambit of the Soft Drink Act.  However framed, the ultimate inquiry must be into economic reality and function where vertical and horizontal are helpful signals but not controlling categories.

We are not prepared to say that the Soft Drink Act might not apply in some cases in which an existing bottler acquires either a competing independent bottler or an additional license from such a bottler.  We are prepared to say that this is not one of those cases.  In sum, though Coca-Cola Southwest and Dr Pepper Company nominally structured parts of their 1984 transaction as a

11

horizontal purchase, that is not dispositive of the question whether the Soft Drink Act applies in deciding whether Coca-Cola Southwest may use and enforce the Dr Pepper franchise. Rather, as we will explain, we conclude that the economic impact of Dr Pepper Company's grant of the Dr Pepper license to Coca-Cola Southwest was more like the economic impact of the territorial restraints and exclusivity provisions measured by the Soft Drink Act than the effects of concentration attending mergers and disappearing competitors.

The FTC's contention must persuade us that a license by a manufacturer of a distributor handling competing brands is not covered by the Soft Drink Act, except in the introduction of new product. Its contention must accommodate the reality that any anticompetitive force of granting a license to a distributor handling competing lines would be drained by dropping the exclusivity feature of the license – a license provision explicitly treated by the Act.

B.

Our analysis proceeds in three steps. First, we start with the proposition that the Soft Drink Act governs when a national syrup manufacturer issues a new exclusive soft drink license to facilitate initial entry of a licensed brand in a regional market. This transaction is aptly characterized as vertical, since the manufacturer's appointment of a downstream bottler is inspired by its effort to offer a soft drink brand not otherwise available in the local market. Second, we assume without deciding that the Soft

12

Drink Act is inapplicable when an existing bottler acquires additional soft drink licenses for established brands from an independent competing bottler. Such an acquisition may be seen as horizontal for Clayton Act purposes insofar as it is impelled primarily by the interests of the acquiring bottler rather than of the national syrup manufacturer.

These two inquiries suggest that the applicability of the Soft Drink Act turns on whether the manufacturer is appointing a new distributor to facilitate its entry into the local market, or whether, instead, the receiving bottler acquires the new license from another existing competitor. Hence, our third step is to decide whether the 1984 transaction between Coca-Cola Southwest and Dr Pepper Company properly belongs in the first category or the second — i.e., whether it is vertically or horizontally inspired. On this third inquiry, we conclude that the Soft Drink Act does apply because the forces driving the 1984 transaction did not come from Coca-Cola Southwest's pursuit of greater market share via the acquisition of an additional license. Rather, the impetus behind the transaction was Dr Pepper Company's decision to cease its own distributing operations and to turn instead to an independent San Antonio bottler for the first time. This decision necessarily required that Dr Pepper license a new independently owned entity. It attempted to sell its subsidiary as a package but was unable to do so.

13

1.

It is undisputed that the Soft Drink Act supplies the proper standard for evaluating territorial and exclusivity restrictions in a soft drink license where the licensed bottler holds that soft drink license and no others. The difficult question is the extent to which the Soft Drink Act applies when the license increases the concentration of exclusive soft drink licenses in the hands of a single bottler. Our first step is to determine whether the Soft Drink Act ever applies when a single bottler holds multiple soft drink licenses.

As the FTC has acknowledged, national syrup manufacturers often gain entry into a regional market by licensing an existing regional bottler that already holds licenses from other syrup manufacturers. This practice is called "piggybacking" in the soft drink industry, and the FTC concedes that the Soft Drink Act was premised in part on congressional approval of piggybacking as a means for market entry:

> The legislative history of [the Soft Drink Act] merely recognizes that piggybacking may facilitate new entry. By giving favorable antitrust treatment to exclusive territories, [the Soft Drink Act] allows the new entrant to promise a prospective bottler an exclusive territory for its brand, and thereby encourages bottlers to accept new brands.

Thus, in noting that the Soft Drink Act gives "favorable antitrust treatment to exclusive territories," the FTC recognizes that some piggybacked soft drink licenses are to be scrutinized under the Soft Drink Act and upheld so long as the requisite substantial and effective competition exists.

14

If the Dr Pepper brand had never been distributed in the San Antonio area, the Soft Drink Act would have governed the validity of Dr Pepper Company's grant of an exclusive Dr Pepper license to an existing San Antonio bottler such as Coca-Cola Southwest, even though that bottler already had other soft drink licenses. Coca-Cola Southwest's receipt of the additional license from Dr Pepper Company concentrates product distribution. Nonetheless, the Soft Drink Act would preclude antitrust scrutiny of the piggybacked Dr Pepper license so long as the Dr Pepper brand faced substantial and effective competition in the relevant market.

2.

Having concluded that the Soft Drink Act governs the validity of a piggybacked soft drink license used to introduce a new brand, we turn to the FTC's argument that the Soft Drink Act nevertheless becomes inapplicable when an existing bottler obtains additional licenses by acquiring them from an established competing bottler. According to the FTC, "nothing in the legislative history of [the Soft Drink Act], let alone the statutory text, suggests a new antitrust standard for evaluating combinations between established competing brands." On this view, the Soft Drink Act does not purport to deprive the FTC of its statutory power to challenge a transaction that amounts to a garden-variety horizontal merger of soft drink licenses held by existing competitors. Since there is no reduction in competition for distribution of Dr Pepper (intrabrand competition) given the exclusivity provisions in the

15

license, the FTC must be challenging a reduction of interbrand competition.

As we explained today, we assume that the FTC could employ the traditional measures of the FTC and Clayton Acts in challenging a transaction in which a bottler with a large market share obtains additional exclusive licenses for competing soft drink brands previously held by another independent bottler. This assumption points to a distinction between the grant of an exclusive license to facilitate vertical entry and the horizontal combination of licenses previously held by established independent bottlers. The Soft Drink Act applies in the former scenario, but not in the latter.

3.

We think that Dr Pepper's licensing of Coca-Cola Southwest is best viewed as a predominantly vertical transaction consummated as part of Dr Pepper Company's effort to end its direct distribution and enter the San Antonio area market through independent distributors. Dr Pepper Company withdrew from that competitive level. Three related factors lead us to this conclusion.

First, Dr Pepper Company initiated the 1984 events. Coca-Cola Southwest did not seek out the Dr Pepper franchise, and acquired it only after Dr Pepper Company offered it for sale. The 1984 transaction between Coca-Cola Southwest and Dr Pepper Company is fueled by different economic impulses and hence different likely economic consequences, from a situation in which a bottler acquires additional licenses from another independent bottler; in the latter

16

scenario, the manufacturer need not be involved, and is not departing and then re-entering. The FTC to be sure, urges that "the horizontal effects on interbrand competition are identical regardless of whether the bottler transferring the franchise is owned by a concentrate company or independently owned." While that may be accurate, so also are the vertical effects unchanged. Such horizontal consequences do not change the reality that Dr Pepper Company entered into this transaction to extricate itself from the distribution business in San Antonio and then return through independent distributors.

Second, our characterization of the transaction as vertical rather than horizontal is consistent with the economic incentives implicated in Dr Pepper Company's decision to undertake it. As Dr Pepper Company explains in its amicus brief:

> The unique structure of this industry means that the more competitive the bottler, the better for the concentrate company, because the more soft drinks the bottler sells, the more concentrate the bottler purchases. As a result, the interests of concentrate companies are, as an economic matter, directly aligned with the interests of the ultimate soft drink consumer: both want the bottler to produce and sell soft drinks at the lowest possible cost and price.

We would not expect a manufacturer to accede to a bottler's effort to acquire additional licenses for the purpose of gaining market share and exercising market power in the regional market, since that outcome would reduce the manufacturer's profits. The dampening effects of horizontal cartelization and horizontally inspired concentration are not in the economic interests of the manufacturer. Hence, a transaction sought out by a manufacturer rather than a bottler is less likely motivated by a bottler's quest

17

for pricing power in the downstream market. It is true that intent is difficult to ascertain, but our primary litmus is the incentive for maximization of profits. Here, economic incentives at least provide corroborating indications that Dr Pepper Company was acting vertically when it selected Coca-Cola Southwest as its exclusively licensed San Antonio bottler.

Third, the form of the transaction involved cancellation of the license held by Dr Pepper Company's former bottling subsidiary and the subsequent issuance of a new Dr Pepper license to Coca-Cola Southwest. Thus, the transaction consisted of the cessation of one vertical arrangement followed by the creation of a second one. We are mindful, to be sure, that the 1984 transaction was nominally framed as a purchase, listing Coca-Cola Southwest as the "buyer" and Dr Pepper Company as the "seller." Nevertheless, the parties were able to consummate the deal only through a sequence of two vertical transactions — Dr Pepper Company ended its direct distribution and then appointed a new, independent bottler. Indeed, since the Dr Pepper licenses expressly provide that they are not transferable, Coca-Cola Southwest could not have acquired the licenses from Dr Pepper-San Antonio without Dr Pepper Company's consent. Dr Pepper Company sought for the first time to appoint an independent bottler, and Coca-Cola Southwest answered the call. Their use of the rubric of a nominal purchase does not change the reality that the transaction effectuated Dr Pepper Company's decision to pursue a vertical licensing agreement with a new distributor.

18

In sum, we find that the 1984 transaction between Coca-Cola Southwest and Dr Pepper Company was a vertically inspired event through which Dr Pepper Company issued an exclusive license to Coca-Cola Southwest as part of its effort to shift to independent distribution for the first time in the San Antonio area market. Hence, we conclude that the Soft Drink Act gives the appropriate standard for deciding whether Coca-Cola Southwest can continue to hold and enforce the Dr Pepper license.

C.

The FTC relies extensively on legislative history in urging that the Soft Drink Act is inapplicable here. As we are mindful of the FTC's admonition against allowing the Soft Drink Act to swallow the other federal antitrust laws, we find it appropriate to respond directly to its concerns. We are satisfied that the Soft Drink Act's legislative history is consistent with our view that the text of the Soft Drink Act mandates its application in this case.

Congress explained that the purpose of the Soft Drink Act was "to clarify the circumstances under which territorial provisions and licenses to manufacture, distribute, and sell trademarked soft drink products are unlawful under the antitrust laws." S. Rep. No. 645, 96 Cong. 2d Sess. 1 (1980); H.R. Rep. No. 118, 96 Cong. 2d Sess. 1 (1980), reprinted in 1980 U.S.C.C.A.N. at 4391. The FTC insists that the "the sole purpose of the Act is to legitimize the use of exclusive territorial limitations in soft drink trademark licensing agreements when the requirements of the statute have been met." The FTC emphasizes the Senate Report's caveat that

19

"[n]othing in this bill is intended to protect any other provisions in such trademark licenses, or any other practice or conduct of licensors or licensees of trademarked soft drink products, from challenge under the antitrust laws." S. Rep. 10. Likewise, the FTC points to the following statement in the House Report: "The Committee intends that [the Soft Drink Act] provide necessary relief without granting antitrust immunity and without establishing any precedent that would weaken our beleaguered antitrust laws." H.R. Rep. 7. Thus, according to the FTC, this legislative history indicates that the Soft Drink Act legitimizes only the use of exclusive territorial restrictions in soft drink franchises but does not limit the reach of other antitrust laws with respect to the actions of the regional bottlers that actually operate with the exclusive licenses.

The legislative history, however, suggests that the authors of the Soft Drink Act were concerned primarily about preserving the vitality of prohibitions on horizontal price fixing and other per se violations. Thus, to that end, Section 3 of the Soft Drink Act declares that the Act does not insulate conduct that is otherwise per se illegal:

> Nothing in this chapter shall be construed to legalize the enforcement of provisions described in section 3501 of this title in trademark licensing contracts or agreements described in that section by means of price fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful.

15 U.S.C. § 3502. This inclusion of § 3 in the Soft Drink Act is significant. It suggests that congressional concerns about not

20

vitiating other antitrust laws found expression in this provision limiting the applicability of the Soft Drink Act, not in an implied limitation on the applicability of § 2.  As explained in the House Report:

> Section 2 provides that the antitrust laws will continue to apply with full force where there is <u>not</u> substantial and effective competition in the relevant markets.  Nor is there any intent to exempt conduct that constitutes a per se violation of the antitrust laws.  Underlining this concern, Section 3 of the bill, added by the Committee amendment, ensures that traditional per se violations will not be exempted under the guise of attempts to enforce otherwise lawful territorial restraints.

H. Rep. at 4.  In short, we think that the § 3 of the Soft Drink Act itself gives the best indication of what the Congress meant in expressing concern about not weakening our "beleagured antitrust laws."  Congress, in explaining that the Soft Drink Act does not "protect any other provisions in such trademark licenses, or any other practice or conduct of licensors or licensees of trademarked soft drink products, from challenge under the antitrust laws," was simply describing the content of § 3 of the Soft Drink Act rather than the expressing the inapplicability of § 2.

We are mindful of the FTC concern that "[a]cceptance of [Coca-Cola Southwest's] novel views regarding the applicability of the [Soft Drink Act] would effectively shield from antitrust scrutiny any transfer of a franchise from one bottler to another."[11]  As we

---

[11]The Commission was persuaded, stating:

In reaching this conclusion, we reject [Coca-Cola Southwest's] efforts to characterize the horizontal acquisition of assets (<u>e.g.</u>, franchise agreements) from a competing bottler as a vertical transaction merely because licenses from concentrate companies are involved.  If this argument were accepted, it

21

have explained, however, our decision today is sufficiently narrow and does not extend a shield to all franchise transfers. We hold only that the Soft Drink Act applies in a case such as this one in which the manufacturer sells its wholly-owned bottling subsidiary and then enters the downstream market by licensing an independent distributor for the first time. We leave open the possibility that the FTC may challenge a bottler's acquisition of licenses held by a competing independent bottler, particularly where such a transfer did not flow from a manufacturer's independent desire to appoint a new distributor.[12]

### III.

In sum, we agree with Coca-Cola Southwest that the FTC should have applied the Soft Drink Act in examining Coca-Cola Southwest's 1984 receipt of the Dr Pepper license and asked whether there was "substantial and effective competition" in the San Antonio area among soft drink products that compete with the Dr Pepper brand.

_____

would immunize virtually all acquisitions by bottlers, including the acquisition of a major competitor, from antitrust scrutiny.

[12]It bears emphasis that application of the Soft Drink Act does not result in immunity from federal antitrust laws; rather, the Act gives a different standard for evaluating soft drink licenses. As explained in the House Report:

> The [Soft Drink Act's] clarification eliminates uncertainty in the law that has plagued the industry, particularly smaller bottlers, during the last decade. It does not grant antitrust immunities. Indeed, the legislation will apply only in situations in which there is `substantial and effective competition' among soft drink bottlers and among their syrup manufacturers in the relevant product and geographic markets.

H. Rep. 2 (emphasis added).

Coca-Cola Southwest asks that we render judgment in its favor under the Soft Drink Act, arguing that the findings below establish that the Dr Pepper brand does face the requisite substantial and effective competition. While Coca-Cola Southwest's argument is strong, we decline its invitation to render judgment at this time. Instead, we think it appropriate to remand this case so that the FTC can have the first opportunity to define and apply the Soft Drink Act. Since the meaning of "substantial and effective competition" for purposes of the Soft Drink Act is unsettled, we prefer to give to the FTC the opportunity to first consider these terms.

VACATED and REMANDED.